UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

YVETTE HAIRSTON,

        Plaintiff,                CIVIL ACTION NO. 11-14974

                                    DISTRICT JUDGE JULIAN ABLE COOK

        v.                          MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION TO GRANT
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. 12), DENY
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 14), AND
REMAND THE CASE TO THE COMMISSIONER**

Plaintiff Yvette Hairston ("Plaintiff") challenges the Commissioner of Social Security's ("Commissioner") final denial of her benefits application. Cross motions for summary judgment are pending (Dkts. 12, 14). Judge Julian Able Cook referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. 3)

## I.    RECOMMENDATION

Because the ALJ failed to consider whether Plaintiff's physical impairment met or medically equaled a listed impairment, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner.

## II. REPORT

### A. *Administrative Proceedings*

Plaintiff applied for disability and disability insurance benefits on March 21, 2007, alleging a disability onset date of January 1, 2001 (Tr. 11). The Commissioner initially denied Plaintiff's application (Tr. 11). On June 22, 2009, Plaintiff appeared with counsel for a hearing before Administrative Law Judge ("ALJ") Patricia S. McKay, who considered the case *de novo*. In a written decision, the ALJ found that Plaintiff was not disabled (Tr. 11-21). Plaintiff requested an Appeals Council review (Tr. 3). On December 9, 2010, the ALJ's decision became the Commissioner's final decision when the Appeals Council declined further review (Tr. 3-5).

### B. *ALJ Findings*

Plaintiff was 45 years old on her alleged disability onset date. She has a college degree. Plaintiff previously worked as a customer service representative, teller and loan review analyst (Tr. 19). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity (Tr. 13).

At step two, the ALJ found Plaintiff had the following "severe" impairments: focal hydromyelia[1] at C6-C7 with mild to moderate foraminal impingement at C6-C7 on the left, and left C6-7 radiculopathy;[2] status post foraminotomy[3] at C6-C7 left, which was performed after the

---

[1] Hydromyelia is a pathological condition in which there is a dilation of the central canal of the spinal cord with increased fluid accumulation. *See Dorlands Illustrated Medical Dictionary*, 892 (31st Ed. 2007).

[2] Radiculopathy is a disease of the nerve roots. *See Dorlands Illustrated Medical Dictionary*, 1595 (31st Ed. 2007).

[3] Foraminotomy is the operation of removing the roof of intervertebral foramina, done for the relief of nerve root compression. *See Dorlands Illustrated Medical Dictionary*, 740 (31st Ed. 2007).

date last insured; trauma to the left knee; anxiety; and depression (Tr. 13).  The ALJ also found Plaintiff had a non-severe impairment of degenerative disc disease in the lumbar spine:

> [o]n June 18, 2008[,] [Plaintiff] had an MRI of the lumbar spine that revealed minimal disc desiccation involving the L4-L5 intervertebral disc.  Richard Krikorian, D.O., concluded that this was an unremarkable MRI of the lumbar spine.
>
> The x-ray of the thoracic spine done in February 2007 revealed mild degenerative changes.  There is no indication in the record that this caused more than minimal limitations on the ability to perform work-related activities; thus, [Plaintiff] does not have a severe impairment of the thoracic spine.

(Tr. 13-14).

At step three, the ALJ found no evidence that Plaintiff had an impairment or combination of impairments that met or medically equaled one of the listed impairments in the regulations (Tr. 14).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform:

> light work . . . with . . . occasional reaching with left upper extremity; and frequent climbing of ladders and stairs, crouching, crawling, [and] kneeling. There would be no job duties that would require sustained focus and concentration.  The job duties would be simple (e.g., 1-2-3 steps) and not detailed work, with no more than occasional changes to work routine.

 (Tr. 15).

At step four, the ALJ found that Plaintiff could not perform her past relevant work (Tr. 19).

At step five, the ALJ denied Plaintiff benefits, finding Plaintiff could perform a significant number of jobs available in the national economy, such as janitor (4,000 jobs available in Southeast Michigan; 8,000 in the State), and industrial jobs (e.g., visual inspector,

sorter, packager and hand assembler) (40,000 jobs available in Southeast Michigan; 80,000 in the State) (Tr. 19-20).

    **C.**    *Administrative Record*

        **1.**    **Plaintiff's Hearing Testimony and Statements**

Plaintiff testified that she is emotional; she has trouble focusing, a short attention span, pain on her left side, carpal tunnel in her right hand, frequent urination at night, trouble balancing and crying spells once a week (Tr. 55, 58-60). Plaintiff started seeing a psychiatrist due to stress (Tr. 56). Her medication makes her sleepy, constipated and disoriented (Tr. 57). She spends her days sleeping or watching television (Tr. 51). According to Plaintiff, she can only sit for 30 minutes, stand for 15-30 minutes, walk a block and lift approximately 10 pounds (Tr. 61).

Despite her limitations, Plaintiff showers and dresses herself, drives her children to school and attends weekly water aerobics classes (Tr. 50, 52-53). She does not do laundry, yard work, cook or shop (she passed out in the store in February of 2009) (Tr. 51-52, 54).

        **2.**    **Medical Evidence**

            *a.*    *Physical Health Evidence*

Plaintiff was involved in a car accident on June 30, 2005 (Tr. 209). On July 6, 2005, she visited her primary care physician, Dr. Barry Moss, who indicated she had arm pain and an "old history of cervical spasms" (Tr. 209).

On October 18, 2005, Dr. Amy Kodrick found Plaintiff's symptoms were secondary to early cervical radiculopthy (Tr. 216, 722).[4] Plaintiff had an MRI of her cervical spine on

---

[4]Radiculitis is the inflammation of the root of a spinal nerve, especially the portion of the root that lies between the spinal cord and the intervertebral canal. *See Dorlands Illustrated Medical Dictionary*, 1595 (31st Ed. 2007).

-4-

October 31, 2005; the Diagnostic Impression was focal hydromyelia at the 6-7 level of Plaintiff's cervical spinal cord and mild to moderate spondylitic[5] exit foraminal impingement on the left at 6-7 (Tr. 720). There was no evidence of disc herniation or canal stenosis (Tr. 720).

On November 14, 2005, Dr. Kodrik performed an EMG and nerve conduction study, which were abnormal. Dr. Kodrik found "electrodiagnostic evidence of a left C6-C7 radiculopathy [and] evidence of ongoing denervation[6] and reinnervation[7] with increased polyphasia in several motor units sampled" (Tr. 716).

Plaintiff had cervical epidural steroid injections on November 17, 2005, February 5, 2007, February 27, 2007, April 3, 2007, May 15, 2007, June 26, 2007, August 7, 2007, September 18, 2007, October 30, 2007, December 11, 2007, February 5, 2008, and March 18, 2008,(Tr. 608, 612, 623, 625, 634, 647, 657, 669, 679, 684, 694, 710).

On February 6, 2007, Dr. Kodrik did not believe conservative treatment (epidural steroid injections, physical therapy, muscle relaxants, etc.) helped Plaintiff. However, Plaintiff's sensation was intact to light touch, pinprick and vibration in the upper and lower extremities, and her physical examination was essentially normal with regard to upper extremity muscle strength, deep tendon reflexes and plantar responses. Plaintiff's gait and station were within normal limits, her finger-to-nose and heel-to-shin were intact as were her rapid repetitive and rapid alternating movements (Tr. 214).

---

[5]Spondylitic pertains to spondylitis, which is an inflammation of the vertebrae. *See Dorlands Illustrated Medical Dictionary*, 1779 (31st Ed. 2007).

[6]Denervation is the interruption of the nerve connection to an organ or part. *See* http://medical-dictionary.thefreedictionary.com/denervation (last visited January 22, 2013).

[7]Reinnervation is the restoration of nerve supply to a part from which it has been lost. *See* http:///medical-dictionary.thefreedictionary.com/reinnervation (last visited January 22, 2013).

On February 15, 2007, Plaintiff had normal lumbar lordosis with no local tenderness or wasting on the lower limbs; her range of motion was normal in flexion, extension, bilateral bending and rotation; she had normal posture with normal spinal balance; she could stand and sit indefinitely; walk 10 minutes; and her gait, toe, heel and tandem walking were normal. However, Plaintiff had low energy, neck pain, arm pain/numbness/weakness, back pain, leg pain/weakness/numbness, headaches, depression and frequent urination (Tr. 737-739). Dr. Teck Mun Soo diagnosed Plaintiff with left C5, C6 radiculopathy (Tr. 739).

On February 20, 2007, Plaintiff had some mild reversal of the normal lordotic curvature of her cervical spine (Tr. 212). An MRI showed anterior osteophytes[8] at C45 with degenerative disc disease and a small hydromyelia at C67 (Tr. 681).

On March 27, 2007, Dr. Moss noted that Plaintiff's shoulder pain was "chronic" and "not controlled" (Tr. 451).

On April 9, 2007, Dr. Kodrik reported that Dr. Soo did not believe Plaintiff was a surgical candidate (Tr. 210). Plaintiff was to continue with physical therapy and serial epidural injections as needed. She was also prescribed a sequential stimulator to use at home (Tr. 211).

On May 5, 2007, Plaintiff reported she could not lift anything or turn her head, but she could dress and bathe herself, button her clothes, use a phone, handle money, and write her name. Her pain increased with walking, and she had to limit her activity on some days. Dr. Jack Belen diagnosed Plaintiff with left cervical radiculopathy, cervical myofascitis and chronic neck pain (Tr. 218).

On June 4, 2007, Plaintiff reported some improvement in her overall pain (Tr. 666).

---

[8]Anterior osteophytes are bone spurs that develop on the front of the vertebrae. *See* http://www.laserspineinstitute.com/back_problems/spinal_bone_spurs/osteophytic/anterior_osteophytes (last visited January 22, 2013).

On February 4, 2008, Dr. Kodrik diagnosed Plaintiff with carpal tunnel syndrome (Tr. 616).

On June 5, 2008, Plaintiff could not get out of bed because of severe pain in her lower back (Tr. 602). An examination revealed some proximal left lower extremity weakness (Tr. 603).

On June 11, 2008, Plaintiff had a mild to moderate degree of spondylosis[9] at the C6-7 foramina on the left and a left C6-7 radiculopathy. Plaintiff had a good range of motion of the cervical spine on flexion, extension and rotation (Tr. 525). She was diagnosed with a C7 radiculopathy on the left with associated spondylosis (Tr. 526). Dr. Darryl Pieper recommended a left C7 foraminotomy, because Plaintiff did not respond well to conservative management (Tr. 816).

On June 18, 2008 – six months after Plaintiff's insured status expired – Plaintiff had an MRI of her lumbar spine that revealed minimal disc desiccation involving the L4-L5 intervertebral disc. There were no disc herniations, and her nerve roots were intact (Tr. 593).

On June 19, 2008, Plaintiff underwent a left C6-C7 foraminotomy (Tr. 522). Plaintiff was diagnosed with left C7 radiculopathy, and an MRI revealed a mild to moderate degree of spondylosis at the C6-C7 left cervical foramen (Tr. 522). After the surgery, Dr. Henry Tong noted that another possible cause of her pain could be left rotator cuff tendinitis (Tr. 811). Dr. Tong performed a left subacromial bursa injection on July 31, 2008 (Tr. 808).

---

[9]Cervical spondylosis is a "degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding ligaments and connective tissue, sometimes with pain or paresthesia radiating along the upper limbs   as a result of pressure on the nerve roots." *See Dorlands Illustrated Medical Dictionary*, 1780 (31st Ed. 2007).

On July 31, 2008, Plaintiff had an MRI of the left shoulder which reveled focal marrow signal abnormality in the posterior aspect of the humeral head which could reflect a small bone contusion (Tr. 818).

### b.     *Mental Health Evidence*

On August 30, 2006, Plaintiff reported that she could not enjoy life: she had panic attacks; anxiety about driving; disruption of thought; irritability; stress; and feelings of helplessness, paranoia and anxiousness (Tr. 405).

On September 11, 2006, Plaintiff felt helpless, depressed and hopeless. (Tr. 404). Plaintiff had a Psychiatric Evaluation on September 20, 2006 and was diagnosed with anxiety disorder (Tr. 402). On September 22, 2006, Plaintiff felt depressed and said she had panic attacks (Tr. 396). On September 29, 2006, Plaintiff felt helpless, irritable and hopeless (Tr. 395).

On June 11, 2007, Plaintiff was diagnosed with dysthymic disorder (Tr. 223);[10] she was diagnosed with recurrent major depression on August 21, 2007 (Tr. 769).

### 3.     **Vocational Expert**

The ALJ asked a vocational expert ("VE") to assume a hypothetical individual who is Plaintiff's age and has her educational and vocational background. The individual can perform the full range of light exertional work, but is limited to occasional reaching with the left upper extremity; and frequent climbing of stairs and ladders, crouching, crawling and kneeling (Tr. 66-67). The VE testified that such an individual could perform Plaintiff's past work as a bank manager (Tr. 67).

---

[10]Dysthymia is a chronic type of depression in which a person's moods are regularly low. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001916 (last visited January 22, 2013).

The ALJ added that the individual would be limited to simple tasks, no detailed work and no job duties that required sustained focus or concentration (Tr. 67). The VE testified that such an individual would be limited to unskilled work such as janitorial work (8,000 jobs available in the State; 4,000 in Southeast Michigan), and industrial work (80,000 jobs available in the State; 40,000 in Southeast Michigan) (Tr. 67-68).

In a third hypothetical, the ALJ added a limitation of no more than occasional changes to the work routine. The VE testified that such an individual could perform the jobs previously identified (Tr. 68).

When the ALJ added the limitation that the individual could not be closely supervised and could have no more than occasional contact with co-workers or the general public, the VE testified that such an individual could still perform the identified jobs (Tr. 68-69).

The ALJ then asked the VE to place the hypothetical individual at the sedentary exertional level with a limitation of occasional reaching with the left upper extremity (Tr. 69-70). The VE testified that such an individual could not perform Plaintiff's past work as she did, but could perform her past work as it is generally performed in the national economy. Such an individual could also perform the identified unskilled jobs (Tr. 70).

When the ALJ added limitations of no job duties that required sustained focus or concentration, simple tasks, no detailed instructions, no more than occasional changes to the work routine, no close supervision, and no more than occasional contact with co-workers and the general public, the VE testified that such an individual would be precluded from Plaintiff's past work (Tr. 70). However, the VE testified that such an individual could perform work in the optical, plastics, pharmacy, and medical supply industries (40,000 jobs available in the State; 20,000 in Southeast Michigan). The ALJ added a sit/stand option, and the VE testified that at

the light exertional level, jobs would be reduced to 30,000 in the State, and 15,000 in Southeast Michigan. At the sedentary level, jobs would be reduced to 14,000 in the State; 7,000 in Southeast Michigan. According to the VE, the janitorial jobs would be eliminated (Tr. 71).

The VE testified that if the ALJ found Plaintiff's testimony fully credible, the hypothetical individual would be precluded from work (Tr. 71-72).

### D. *Plaintiff's Claims of Error*

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record and is contrary to the Social Security Act, because the ALJ: (1) failed to consider whether Plaintiff's impairments meet or medically equal Listing 1.04; (2) improperly analyzed Listing 12. 04; (3) erred in assessing Plaintiff's credibility; and (4) erred in her RFC determination.

### III. DISCUSSION

#### A. *Framework for Disability Determinations*

Under the Social Security Act, (the "Act") Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B. *Standard of Review*

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses" (internal quotation marks omitted)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in [her] written decision every piece of evidence submitted by a party" (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

  *C.*  *Analysis*

"At the third step in the disability evaluation process, a claimant will be found disabled if [her] impairment meets *or equals* one of the listings in the Listing of Impairments." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at **2 (6th Cir. April 1, 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010)) (emphasis in original).

> A claimant must satisfy all of the criteria to "meet" the listing. However, a claimant is also disabled if her impairment is the *medical equivalent* of a listing, which means it is "at least equal in severity and duration to the criteria of any listed impairment." An administrative law judge must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for a[] [l]isted [i]mpairment.

*Reynolds*, 2011 WL 1228165 at **2 (internal citations omitted) (emphasis in original). To comply with step three, the ALJ does not have to articulate, at length, the medical equivalency issue; however, she should review all of the evidence surrounding Plaintiff's severe and non-severe impairments to determine if they are medically equivalent to a listed impairment. *See Bledsoe v. Barnhart*, 2006 WL 229795 at **3 (6th Cir. Jan. 31, 2006). "The mere failure to discuss every single impairment under the step three analysis is not a procedural error." *Id.*

Plaintiff challenges the ALJ's step-three finding that her impairments do not meet or medically equal Listing 1.04:

> **1.04**   *Disorders of the spine* (e.g., degenerative disc disease) [w]ith:
>
> A.   Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. pt. 404, subpt. P, App. 1.

At step two, the ALJ found both a physical and mental impairment: "focal hydromyelia at C6-7 with mild to moderate foraminal impingement at C6-C7 on the left, and left C6-7

-13-

radiculopathy; status post foraminotomy at C6-C7 left, which was performed after the date last insured" and "anxiety and depression." The ALJ also found Plaintiff had the non-severe impairment of "degenerative disc disease in the lumbar spine." At step three, the ALJ said she "evaluated [Plaintiff's] impairments in the context of the Listings and concludes that she does not manifest clinical signs and findings that meet the specific criteria of any of the Listings."[11] But saying something does not make it so. The ALJ conducted a thorough analysis of the "Affective Disorders" Listing, Subsection 12.04, 20 C.F.R. pt. 404, Subpt. P, App. 1 (Tr. 14-15) then proceeded to the next step – determining Plaintiff's RFC – without considering whether Plaintiff's physical impairments met or equaled a Listing under section 1.00. This was error. "[T]he ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Reynolds*, 2011 WL 1228165 at \*\*4 (citations omitted).

When faced with similarly conclusory Step 3 analyses, courts have found that an ALJ's lack of narrative deprives the federal court of its ability to act as an appellate tribunal and instead forces the court to become the finder of fact:

> In this case, the ALJ did not discuss the evidence or his reasons for determining that appellant was not disabled at step three, or even identify the relevant Listing or Listings; he merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment. . . . Such a bare conclusion is beyond meaningful judicial review. Under the Social Security Act,
>
>> [t]he Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter. Any such decision by the

---

[11] Importantly, the ALJ does not say whether Plaintiff's impairments *medically equal* the specific criteria of any of the Listings.

-14-

> Commissioner of Social Security which involves a
> determination of disability and which is in whole or
> in part unfavorable to such individual shall contain
> a statement of the case, in understandable language,
> setting forth a discussion of the evidence, and
> stating the Commissioner's determination and the
> reason or reasons upon which it is based.
>
> 42 U.S.C. 405(b)(1). Under this statute, the ALJ was required to
> discuss the evidence and explain why he found that appellant was
> not disabled at step three.
>
> This statutory requirement fits hand in glove with our standard of
> review. By congressional design, as well as by administrative due
> process standards, this court should not properly engage in the task
> of weighing evidence in cases before the Social Security
> Administration. Rather, we review the Secretary's decision only to
> determine whether [his] factual findings are supported by
> substantial evidence and whether [he] applied the correct legal
> standards.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996); *see also e.g., Miller v. Comm'r of Soc. Sec.*, 181 F. Supp. 2d 816, 820 (S.D. Ohio 2001) (citing *Clifton* with approval and explaining, "[t]he Commissioner argues that the error in this case, if any, was made by plaintiff, who failed to satisfy his Step 3 burden of coming forward with evidence to prove that he was disabled under the Listings. . . . [W]hether or not plaintiff came forward with the requisite evidence at Step 3, the ALJ was required to discuss that evidence, relative to the Listings, as required by *Clifton* . . . the ALJ failed to do so, thus meriting a sentence four remand"); *Torres v. Comm'r of Soc. Sec.*, 279 Fed. App'x 149, 151-52 (3d Cir. 2008) ("This court has stated that it is the ALJ's responsibility to identify the relevant listed impairment(s) and develop the arguments both for and against granting benefits" (internal quotation marks, alterations, and citation omitted));

This case should be remanded for a discussion of the evidence and an explanation of the ALJ's reasoning supporting the determination that Plaintiff's impairments do not meet or medically equal a listed impairment. *See Reynolds*, 2011 WL 1228165 at \*\*4; *see also*

-15-

*Christephore v. Comm'r of Soc. Sec.*, 2012 WL 2274328 at *6 (E.D. Mich. June 18, 2012) ("it is not the Court's job to conduct a *de novo* review of the evidence or to rubber stamp the ALJ's decision").

Because the ALJ's step three error warrants remand, Plaintiff's additional arguments need not be addressed.

## IV. CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

                        <u>s/Mark A. Randon</u>  
                        Mark A. Randon  
                        United States Magistrate Judge

Dated: January 25, 2013

### *Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, January 25, 2013, by electronic and/or ordinary mail.*

                        <u>*s/Eddrey Butts*</u>  
                        *Case Manager*